## Light, Heat & Water Co. *v.* City of Jackson.

1. **Municipal Corporations.** *Water contract. Statute authorizing same. Construction of statute. Term "from year to year" interpreted. Act February 29, 1888, Laws, p. 235.*

   A contract made by the authorities of a municipality with a water company, for supplying the city with water for a period of twenty years, is within the power conferred on them by an act of the legislature authorizing them to contract with any reliable corporation for supplying the city with water, from year to year, in view of the purpose of the delegation of power, the nature of the body on which it was conferred, the subject-matter of the contract, the large outlay for machinery and appliances, the profit of which was dependent upon the permanency of the enterprise, and the cotemporaneous legislation, from which the intent to authorize a contract of as great duration as twenty-five years is deducible.

2. **Same.** *Object of contract. Contract for results, not for appliances. Mains. Acceptance of mains by city. Effect of same.*

   Where a contract for supplying a city and its inhabitants with water for domestic and public purposes, including "first-class fire pro-

tection," specifies that the machinery and appliances shall be of a certain character, and of a capacity to supply a certain force and quantity of water, and that the mains laid in a specified area shall be of a specified maximum and minimum size, except that smaller mains might be laid where they were found adequate to afford first-class fire protection. the acceptance by the city of mains of a smaller size than the maximum specified in the contract, will not relieve the company from the duty of supplying the quantity and force of water contracted for, since by the contract, which is a continuing one, the city stipulated for results, and not the means of attaining them, except that the quantity and force of the water shall not be required to exceed what can be supplied by the maximum of power exerted against the minimum of resistance in the specified area, by the use of the specified machinery, appliances and mains.

3. Same. *Rescission of contract. Breach of contract. Actual damage.*

While equity will not rescind a continuing contract for an occasional and immaterial breach not going to the substance of the contract, where a water company has failed to comply with its contract to supply a city, for a specified period, with water in such force and quantity as to afford first-class protection against fire, a bill for rescission affords the appropriate remedy, and the right of the city to demand the same is not affected by its failure to aver actual damage in any instance.

4. Same. *Direct pressure. Demand therefor. Duty of water company.*

Where a water company contracts to supply a city with water in such force and quantity as to afford protection against fires, the two pumps contracted for to be capable of working singly or together, and against a specified pressure, when necessary for fire protection, furnishing direct pressure, it is not entitled to any formal demand for direct pressure, but is bound to take notice of such fires as it would be negligence not to know of, in view of its opportunities of information and the nature of its business, and to supply the pressure whenever the necessity therefor arises.

5. Same. *Failure to repair hydrants promptly. Forfeiture of specified sum. Penalty, not liquidated damages.*

A stipulation in a contract to supply a city with water, that in case a hydrant remains out of order for six days after notice to the company, the company shall forfeit $10 per week for each week such hydrant remains out of repair, is in the nature of a penalty for the occasional temporary neglect, and not liquidated damages for an entire breach of the contract.

FROM the chancery court of the first district of Hinds county. HON. H. C. CONN, Chancellor.

By § 3 of an act of the legislature, entitled "An act to authorize the board of mayor and aldermen of the city of Jackson to sell College Green, North Jackson, and issue bonds for the erection of a public school building, and for other purposes," approved February 29, 1888, it was provided as follows: "*Be it further enacted*, That the said mayor and aldermen be, and they are hereby, authorized and empowered to contract with any reliable corporation, association or individual for supplying the said city of Jackson with water and electric or gas lights from year to year, and to levy and collect a tax necessary to discharge the debt in that behalf contracted by them, and they are directed and required, from time to time, to pay the interest annually accruing on the bonds issued under the second section of this act, and to create a proper sinking fund to discharge the same at maturity, or to purchase the same before maturity." Acts, p. 234.

Under authority of this act, the said board of mayor and aldermen, on May 11, 1888, entered into the following contract with the Light, Heat & Water Company of Jackson, Miss.:

"WHEREAS, Under the charter of the city of Jackson, State of Mississippi, as amended by the act of the legislature of the State of Mississippi, entitled 'An act to authorize the board of mayor and aldermen of the city of Jackson to sell College Green, North Jackson, and issue bonds for the erection of a public school building, and for other purposes,' approved February 29, 1888, the city of Jackson desires to have the benefits to be derived from a system of waterworks, and desires to purchase a supply of water for public purposes in said city, as hereinafter set forth, from The Light, Heat & Water Company of Jackson, Miss., a corporation duly chartered by the legislature of the State of Mississippi, and said board of mayor and aldermen, being by law fully authorized to enter into this contract for and on behalf of said city, now this contract made and

entered into between the city of Jackson, State of Mississippi, and The Light, Heat & Water Company of Jackson, Miss., witnesseth: That said company, in consideration of ten dollars in hand paid by said city, the receipt whereof is hereby acknowledged, and the other payments and covenants hereinafter set forth to be made and performed by said city, hereby binds and obligates itself to said city as follows: That said company will provide and lay down, through the principal streets of said city, for eight linear miles, beneath the suface of the earth, in a good and workmanlike manner, water mains of proper size and dimensions to supply all reasonable requirements of said city or its citizens for water, within twelve months from the date of the execution of this contract (suspension of the work by the act of God, the public enemy, legal process or circumstances beyond the control of said company excepted), and shall have and maintain at all times (except when suspended for necessary repairs or the above excepted causes), for the full period of twenty years from the commencement of operations by its works, a flow of pure, wholesome water, proper for drinking and lavatory purposes, through said mains, and shall, at eighty points on said mains, to be designated by the mayor of said city within thirty days after notice, in writing, so to do, and, if not designated within such time, then said company shall designate such points, make proper openings and insert in such mains double fire hydrants of approved pattern, ten of which shall also have a steamer nozzle, said nozzles to fit the hose now in use in the fire department of said city.

"2. The said water supply may be taken from streams, wells, springs, impounding reservoirs or other available sources, such water to be pure, wholesome in quality and suitable for drinking, domestic and culinary purposes, and in quantity sufficient to meet the needs of said city and its inhabitants as far as the pipes herein mentioned and their extensions when ordered shall reach and as the growth of said city may render needful.

"3. The said works shall be complete and perfect in all its

details. The machinery of said works shall consist of two separate and distinct pumps, with suitable boilers and other attachments capable of pumping two millions of gallons of water in twenty-four hours against a pressure equivalent to at least a pressure of one hundred and fifteen feet head at a piston speed not greater than one hundred and twenty feet per minute for domestic supply; also, to be able to work against one hundred and twenty-five pounds per square inch pressure when necessary for fire protection; the pumps shall be so arranged that they may be worked singly or together, as required, furnishing direct pressure; the pump house shall be fireproof, of handsome architectural design, of ample size, and conveniently arranged for the holding and operating of the necessary pumps, boilers and machinery. All the machinery shall be increased from time to time as the growth of the city may render necessary. The mains shall be of iron pipe ranging in size from twelve to four inches in diameter, all to be of the best quality of iron, coated inside and out, while hot, with waterproof varnish, and shall be tested at the place of their manufacture, before leaving the shops, to withstand a hydrostatic pressure of three hundred pounds to the square inch, and shall be of ample size to carry out the provisions of this agreement and to afford the city where such pipes are laid first-class fire protection.

"4. In the employment of laborers during the construction and operation of the works, preference shall be given to the residents of the city of Jackson, and in the use of skilled labor, all other things being equal, the same preference shall be given. During the progress of the work said company shall not unnecessarily obstruct any street, and in laying its pipes and conduits said company shall properly repair and make good its pipes and conduits previously laid, that may have been disturbed by it, and shall complete each part of the work commenced therein as speedily as possible, and restore the said streets to as good condition, as near as practicable, as they were before said work commenced. In the erection, construc-

tion and repair of said works in any street, and in making all necessary excavations for repairs, and in removing pavements and sidewalks for repairs, said company shall suitably guard and protect the same, so as to prevent injury to persons and to public and private property by reason thereof; and the said company shall be liable for all damages by failure to so guard persons and property from injury by reason of the erection, construction or repair of said works, or by removal of such sidewalks or pavements, or by the making of such excavations and repairs as aforesaid, when occasioned by the negligence of said company, its agents or employees; and said company shall hold the city harmless therefrom, and pay any sum or sums that may be recovered against said city, by serving notice, in writing, on said company of the pending of any such suit for such damages, and giving said company an opportunity to defend.

"5. Upon the completion of said works, they shall be tested as to their power and capacity, when such works shall throw water, with the aid of their pumping machinery, from any six separate hydrants located in the business part of said city, at one and the same time, one stream from each hydrant, through one hundred feet of two and one-half inch hose, and a one-inch nozzle, ninety feet high. That, at and from the date of the completion of said test, if successful, the rental for fire service herein stipulated for shall begin, and said city agrees to furnish said company, upon said test, a certificate in writing to that effect.

"6. The said company shall place a sufficient number of gate valves of approved manufacture, so as to permit shutting off water from portions of the system without interfering with the general supply. The said company may be required by the city, at any time during the proper season of the year, to make extensions of the pipe system of said works, with hydrants placed thereon not less than three hundred nor more than four hundred and fifty feet apart, by giving thirty days' notice to

said company, but, as a condition of making such extensions, the said city agrees to pay rent for public fire service upon such extensions at the rate of forty-five dollars per annum for each hydrant during the term of this contract, said rental to be paid quarterly, as other rentals for public fire hydrants are payable. The said city may, however, at any time, cause to be placed, under the direction of the company, additional hydrants for public fire purposes on the original eight miles of mains, upon the payment of the actual cost of said additional hydrants and the expense of laying the same, and shall be liable for no rental for such additional hydrants so located on said original mains.

"7. The said company shall also construct and maintain in good working order, an electric fire-alarm bell in the pump house, which may be connected by said city with the city hall and police stations, and with any fire alarm system which is or may hereafter be in use in said city, and will also erect and maintain in its pump house a telephone station, which shall be connected with the telephone exchange of the said city, and may use as a fire alarm.

" 8. That said eighty fire hydrants, and such as may be placed on the extension of original mains as aforesaid, shall be used only for fire purposes, except that for five minutes each day, between the hours of 11 A.M. and 3 P.M., one of the nozzles of one of said hydrants every three squares, may be opened by a city officer for flushing purposes, and said hydrants may also be used for fire practice, provided, in such flushing or fire practice, no more than two nozzles shall be opened at the same time, and notice of the intention to open the same be given to said company, and none of said hydrants shall be so used during a fire alarm or a fire. That said company, for said period of twenty years, shall supply as aforesaid, water for all of said fire hydrants at the sole cost and expense of said company. That said company, for said period, shall supply as aforesaid with water three drinking fountains for man and beast, and shall erect them at such points as the mayor may designate

along its mains; and also a public fountain, to discharge through an orifice not exceeding one-eighth of an inch in diameter, for eight months in the year, during eight hours per day; and said company shall also furnish with a full supply of water during said period, for drinking and lavatory purposes, the free public schools of said city, the city public buildings or such parts thereof as are used for city purposes, and all the churches in said city which are on the mains of said company. That the city shall use water as provided in all the above cases, in a reasonable manner, and without unnecessary waste.

" 9. The company shall not charge to consumers during the continuance of this contract exceeding the following rates, which shall be due in quarterly installments, in advance, and said company shall have the right at will to supply consumers at meter rates instead of assessed rates. The connection between the main and consumer shall be made at the expense of the consumer, and the lowest rate to one consumer, in any case, shall be five dollars per annum.

## " RATES.

" The water rents charged by said company to consumers for domestic or manufacturing purposes shall not exceed the average rates charged in other cities in the State of Mississippi similarly situated and being supplied by a like system. No connections made with mains, however, are to afford an annual rental of less than five dollars.

" 10. The said company shall have power and authority to make, adopt, and enforce regulations not inconsistent with law for their convenience and security, as well as that of the public, in the operation of said works, and shall have the right, at all reasonable times of the day, to have access to the water pipes and meters of any water taken, to protect itself against abuse or fraud and make repair, and may require all water takers to sign a contract to all reasonable regulations as a condition of furnishing water.

"11. The said company shall constantly, day and night, except in case of unavoidable accident, keep all the said hydrants supplied with water for fire service, and shall keep them in good order and efficiency for such purpose. The chief of the fire department of said city, and, in case of his absence, the officer in charge thereof, shall inspect said hydrants from time to time, and if, on inspection, any of said hydrants are found to be out of working order, he shall forthwith notify the chief officer in charge of the waterworks, in writing, specifying the hydrant or hydrants out of order, and the said company shall forthwith repair the same, and if not in working order in six days after such notice the said company shall pay to the said city a forfeit of ten dollars per week for each week for each hydrant while such hydrant or hydrants so remain out of order.

"12. In consideration of the benefits which may be derived by the city of Jackson and its inhabitants from the construction and operation of the waterworks, and in further consideration of the water supply hereby secured for public use, and as an inducement for the said company to enter upon the construction of the said waterworks and to secure the advantages proposed to her citizens from said company, the said city of Jackson hereby grants to said company the exclusive right and privilege to have, maintain and operate the franchises granted by the charter of said company in said city for the full period of twenty-five years from the date of the execution of this contract, subject, however, to prior termination by the right of said city to purchase as in this contract provided; and for the same consideration, and as the same inducement, the said city of Jackson hereby rents of said company, for the uses herein mentioned, the hydrants hereinbefore described, for and during the full term and period of twenty years from the completion of said work, unless the same shall be sooner terminated as provided herein. The said city of Jackson hereby agrees to use the said hydrants for the extinguishment of fires only, except when used as herein provided for, and to make good to

said company any injury which may happen to any of the said hydrants, when caused by the carelessness or neglect of the city's employees; and said city hereby promises to pay to said company, or its order, an annual rental of sixty dollars per hydrant for each and every of said eighty public fire hydrants located on said original mains, for the full term and period of twenty years from the commencement of the operation of this contract, or for such part of said period as said waterworks shall be operated under this contract, which rental said city promises to pay in quarterly installments of one-fourth, on the first days of January, April, July and October in each year during such term.   But if, in any year during said period, the private consumption of water shall so increase, either by growth of said city or by an excess of subscriptions over the present estimate, as to reach an annual subscription by private consumers (hotels, railroads, factories and public buildings excepted) of more than thirty faucets on each side of any street, or sixty faucets on either or both sides of any street within any square of three hundred and twenty feet in said city, then said company hereby agrees to rebate on the price of the rent for such year, on one public fire hydrant within such square, five dollars for every fire faucet, in excess of said sixty faucets, upon which the annual rent has been collected.

"13.  The said city hereby covenants to levy and collect a sufficient tax, annually, as provided by the amendment to the charter of said city, upon all taxable property upon the assessment rolls of said city, subject by law to taxation, to meet the payments under this contract, as they respectively mature during the existence of this and any other contract with said company for public fire service, and the proceeds of such levy shall be kept a separate fund known as the water fund, and shall be irrevocably dedicated to the payment of hydrant rentals under this contract, and shall not be otherwise employed, except that any surplus in any year, after payment of all sums due under this contract for that year, may be used as said city may determine.

" 14. The city of Jackson, on request of said company, shall adopt and keep in force ordinances protecting the said company in the safe and unmolested enjoyment of its franchises, from waste of water by consumers, against pollution of the source of supply, and also to carry into effect, by ordinance, this contract.

" 15. The city of Jackson, through the board of mayor and aldermen, shall have the right, to be exercised within sixty days after the execution of this contract, to designate the streets of said city upon which said eight miles of mains shall be laid, and the distance the same are to extend on each street, provided the whole shall not exceed eight linear miles, and, in case of failure of said board to so locate, then the company shall have the right to locate said mains, after the expiration of said sixty days, on any of the streets of said city.

" 16. The said city hereby authorizes, grants to, and empowers said company, under the provisions of the charter of the said company, the right, franchise and privilege to build, construct, maintain and operate and own waterworks in the city of Jackson, State of Mississippi; to supply said city and its inhabitants with water as aforesaid; to lay pipes and mains for the purpose of conveying water through the streets and alleys of said city; to acquire and hold, as by its charter authorized, any and all real estate in said city; to have all easements and water rights necessary to that end and purpose; to use, within the present and future limits of said city, any and all streets, alleys, avenues, bridges and such public grounds as are now or may be hereafter laid out, while laying and repairing such waterworks; to receive, store, purify, conduct and distribute water through the city; to erect and maintain settling basins, filtering galleries, reservoirs, water towers, pump houses and all other necessary buildings, engines, machinery and other appliances and attachments necessary or expedient for the proper conducting and carrying on such waterworks; to cross any stream within the present or future limits of said city, for the

purpose of laying or extending their pipes, conduits or aqueducts as may be necessary for proper distribution of water throughout said city of Jackson, as to afford the most adequate supply for domestic use and the greatest protection against fire.

" 17. The said city of Jackson, in case it desires, and being thereunto duly authorized, hereby reserves the right to purchase of said company the said waterworks and all the land and machinery, pipes, mains, hydrants, property, water privileges, rights, leases and appurtenances, any way belonging or appertaining to the said waterworks system; and said company hereby covenants and agrees that it will sell and convey the same to the city of Jackson, at the expiration of ten years, and any interval of five years thereafter, at an appraised price, to be determined as follows: Whenever the city shall determine or desire to purchase said waterworks system, the board of mayor and aldermen thereof shall give written notice to said company of the intention to purchase at the expiration of said ten years or of the interval of five years following said notice; such notice shall be served at least one year prior to the expiration of said ten years or of the interval of five years, and shall demand of said company to appoint and select two persons to act as appraisers in fixing and appraising the price of the same, which notice shall be served upon said company; within thirty days after the date of the service of said notice the said company and the said city shall each select two persons as appraisers.  In case of a failure of the city to appoint such two persons, such option may be deemed thereby ended.  The four appraisers thus chosen shall, within ten days thereafter, select a fifth, which five persons thus selected shall, within thirty days thereafter, determine the purchase price of the same.  In case said company shall fail, neglect, or refuse to select two such appraisers within the time herein required, or in case said four appraisers should neglect or refuse to appoint a fifth appraiser within the time required, then, in either or both cases, as may be, the two appraisers or the fifth appraiser may be appointed

73 Miss.—39

by the judge of the circuit court of Hinds county, State of Mississippi, on the application of the board of mayor and aldermen, on ten days' notice, in writing, to the said company. The persons selected as appraisers shall not be residents of Jackson or persons in the employment or interest of the city or of said company. Said five persons at a meeting, of which all of them shall have had personal notice, may and shall, as appraisers, on examination and evidence of the property and assets of said company, and of the liens by deed of trust, mortgage or judgment thereon, fix and determine the actual value or worth of said waterworks system and of its property of every kind and description, real, personal and mixed, including franchises, real estate, right of way, easements, improvements, contracts, rentals, income, buildings, betterments, machinery or appliances, mains, hydrants, reservoirs, and all appurtenances placed upon or in any way connected with the property and used for the operation of said waterworks, or which may be leased to said company by said city, and constituting a part of the waterworks system, and as affected by lien by deed of trust, mortgage or judgment, which may be imposed upon said property, and in existence at the date of such appraisement, if any. At the time such appraisement may be made, said appraisers shall state, in writing, in duplicate, the amount of their appraisement, and shall deliver one in duplicate to said company and shall file the other with the clerk of said city within ten days after the same is made, and said city shall have the right, within thirty days after said award shall be filed with the city clerk, to exercise the option to take said property and waterworks system so appraised, at the amount of said award, and, by assuming to pay the amount, shall be payable to the company in cash, and said purchase money shall be paid within six months from the time said city shall elect to purchase; and all forfeitures which may at any time of payment be due to said city under this contract, shall be deducted from such purchase price. In case said city shall not

pay said purchase money, and assume to pay such lien debts within said six months, then such failure shall, *ipso facto*, rescind and annul said sale and said option, and the city shall, in that event, pay all the costs of said appraisement.

" 19. Before the placing of water mains on a street not having an established grade, the grade of said street shall be established by the city, and, in the event said city neglects to establish said grade, and water mains or pipes have to be on that account relaid, the city shall bear the expense of changing said pipes. In witness whereof," etc.

The waterworks system contemplated by this contract was shortly afterwards established and went into operation. On October 12, 1895, the city of Jackson filed its bill of complaint, in which it averred and charged that the contract was null and void, because the same undertook to bind the city to pay for water for a period of twenty-five years, at a price and rate fixed therein, which was *ultra vires*, the said board not being empowered to make a contract for water except by the year, or "from year to year." It further averred and charged that, while the city had been paying to the defendant corporation, annually, the rent of the hydrants stipulated for in the contract, and had also paid for water, under the contract, up to October, 1895, and in all things complied with the contract, the defendant had not complied with the same nor performed its obligations thereunder in this, to wit: (1) It had not provided, laid down and maintained within the city, water mains of proper size and dimensions to supply all reasonable requirements of the city and its citizens for water, and had not maintained at all times a flow of pure, wholesome water proper for drinking and lavatory purposes, and suitable for domestic and culinary uses, and had not furnished water wholesome in quality and sufficient in quantity to meet the needs of the city and its inhabitants, as far as the pipes mentioned in the contract and their extensions, ordered by the mayor and aldermen, have reached. (2) It had not kept its works complete and perfect in

all details, and its pumps and machinery had not been kept up to the standard required by § 3 of the contract, and the machinery had not been increased from time to time as the growth of the city rendered necessary, and the pressure had not been sufficient at all times for fire purposes, but had, for a greater part, if not all, the time, been wholly insufficient for extinguishing fires, and it had failed, so far, in the particular of maintaining the necessary pressure for the extinguishment of fire; that many times during the life of said contract, when fires have actually occured, in the city, the pressure was not sufficient to throw water to the height of a single story building, and, as a consequence of defendant's failure to maintain the pressure required by said contract, in several instances where fires have occurred, valuable property belonging to citizens of the city has been destroyed, which could otherwise have been saved. (3) It had not furnished and laid, especially in the extensions made, pipes of proper strength and ample size to carry out the provisions of the contract, and to afford the city, where such pipes have been laid, first-class fire protection, and in no particular had it kept its plant, machinery, mains and pipes up to that standard of improvement, power and dimensions contemplated by the contract.

The city claimed that it had been damaged by defendants' breaches of the contract, in the sum of ten thousand dollars, and it was entitled to recover the same and to have the contract vacated and annulled, and asked for that ruling, and also for general relief.

The Light, Heat & Water Company demurred to the bill, assigning as grounds of demurrer the following: 1. The contract mentioned was not void, but valid in law. 2. If invalid, said contract was not then rescindable, because the *status quo* could not be restored. 3. The extraordinary direct pressure provided for in the contract need not be furnished, except upon call or demand of complainant, and none was averred in the bill. 4. Water mains put down by complainants' direction, or

accepted by them as put down, was a performance of said contract by the defendant.    5. Water mains of not less than four inches in diameter, accepted by complainant, entitled it to no better service, or more protection, against fire than could be given by mains of that size and the pressure of the kind stipulated for in said contract could give.    6. Mains laid where, and of the size directed by complainant, or accepted by it, as performance of said contract, cannot be complained of by complainant as insufficient protection against fire because of size.    7. Complainant cannot complain of the want of the prescribed contract pressure without first showing, by averment, that harm came of it upon failure to furnish it after demand by it made. 8. Rescission is not demandable without averment of complainant of failure and opportunity given to rectify the wrong complained of.    9. Failure by defendant to perform the contract in some particulars, as averred, does not justify rescission.

In order to avoid any question as to the necessity for an answer to any part of the bill, and to obtain as soon as possible an authoritative determination of the controlling questions involved, it was agreed between the solicitors of the parties complainant and defendant that the following questions should be considered as raised by the demurrer, viz.: Was the contract made by the city and company and set forth in the bill invalid for want of power in the city to contract for a series of years? If it was thus invalid, should it be now rescinded or canceled, and on what terms, in view of its execution by the parties for a number of years? Was the extraordinary direct pressure contemplated and provided for by contract, to be furnished, in case of fire, without any call on the company for it by anyone in behalf of the city? Were water mains not less than four inches in diameter, put down by direction of the city, or accepted by it after being put down, a performance of the contract by the company? Where a main not less than four inches in diameter was put down and accepted by the city, was it entitled, by the terms of the contract, to any better service or

greater protection against fire than a main of that size and pressure of the kind stipulated for in the contract would give? If the company put down mains where the city directed, and of the size directed or accepted by it as a performance, can the city complain of want of sufficient protection against fire arising from this? Can the city complain of the want of the prescribed pressure without showing that harm resulted from failure of the company to furnish it, on application for it, in a given case or cases? Can rescission be demanded without complaint having been made of the particular failure complained of, and opportunity given to rectify the wrong complained of? If there was failure by the company to perform the contract in some particulars, does that justify a rescission of the contract?

Demurrer overruled; and appeal by defendant.

*Calhoon & Green,* for the appellant.

The word "supplying" is a participle, and expresses continuing action. The continuing action, as it is used in the act under review, is "from year to year." Under the rules of grammar, the words "from year to year" cannot modify or limit the verb "contract," but must apply to the word "supplying," the action of which they modify as a prepositional phrase. All the terms of the contract were clearly left to the discretion of the mayor and aldermen, and the words "from year to year" go merely to express the purpose of the grant of power. The phrase "from year to year" is borrowed from its use in defining the relation of landlord and tenant, and its signification there expresses an occupancy of indefinite duration, and for more than one year, and subject to termination by notice to quit at the end of any year of its duration. Tiedeman on Real Property, § 214. The same idea is conveyed by § 1330, code of 1880, the statute then in force, whereby notice to quit is made necessary only when the term is not to expire at a fixed time, and tenancies "from year to year" are expressly included in the class in which notice is necessary, and

hence are of indefinite duration.   The time and expense in-
volved in establishing a system of waterworks, and the neces-
sity of permanency to the city as well as the company in respect
to a matter so important to its well-being, show that the con-
struction contended for by the appellee could not have been
within the legislative intent.   The interpretation put upon the
act by the appellant is further aided by cotemporaneous legis-
lation, from which it a'bundantly appears that twenty-five years
was not thought too long a time for such contracts to last.
Acts of 1888, p. 468; § 2948, Code of 1892.

The appellees were not entitled to have the contract rescinded
as *ultra vires* without offering to restore the *status quo*.   *Deans*
v. *Robertson*, 64 Miss., 195; *Mortgage Co.* v. *Jefferson*, 69 *Ib.*,
770; *Nolan Snodgrass*, 70 *Ib.*, 794; *Waterworks Co.* v. *Co-
lumbus*, 48 Kan., 112; *Mayor* v. *Huff*, 60 Ga., 222; *Chapman*
v. *County*, 107 U. S., 355.   "If the contract has been exe-
cuted in whole or in part, there may be an estoppel or other
ground of recovery based upon what has been done."   1
Dillon on Munic. Corp., § 444 and notes; 2 *Ib.*, § 575 and
notes; Field on Corp., § 263, *et seq.; Brown* v. *Kansas City*,
39 Kan., 54; *Prairie Lodge* v. *Smith*, 58 Miss., 301.

Rescission cannot be demanded without complaint having been
made of the particular failure complained of and opportunity
given to rectify the wrong complained of.   Here was a con-
tract which, so far as the machinery, mains, etc., are concerned,
had been accepted as performed by the city.   It involved a
large system of many miles of distance.   The chief engineer
of the fire department was made the inspector of the hydrants,
to see that they were in good order, and liquidated damages of
ten dollars a week were stipulated for every week any one,
after notice to the company, remained out of order.   Rescis-
sion of a contract that had been accepted as performed, would
not be in any sense a matter of right.   Forfeitures are not es-
tablished in equity except for the most satisfactory reasons and
upon a clear default; nor will equity permit a party to accept

certain acts as performance of a contract, and then, without notice or objection, to cancel it. *Farmers' Loan, etc., Co.* v. *Galesburg*, 133 U. S., 158. Counsel for the appellee cite this case, but so far as applicable it is favorable to the appellant. See, also, *Hester* v. *Hooker*, 7 Smed. & M., 778; *Wilson* v. *Charlotte*, 108 N. C., 121; *Water Co.* v. *Winfield*, 51 Kan., 121.

Was the extraordinary direct pressure, contemplated and provided for by the contract, to be furnished, in case of fire, without a call on the company for it by anyone in behalf of the city? Section 3 of the contract provides that the works proposed to be built shall be complete and perfect in all their details. "The machinery . . . shall consist of two separate and distinct pumps, with suitable boilers and other attachments capable of pumping two millions of gallons of water in twenty-four hours, against a pressure equivalent to at least a pressure of 115 feet head at a piston speed not greater than 120 feet per minute for domestic supply; also to be able to work against 125 pounds per square inch pressure when necessary for fire protection. The pumps shall be so arranged that they may be worked singly or together as required, furnishing direct pressure. All the machinery shall be increased from time to time as the growth of the city may render necessary. The mains shall be of iron pipe varying in size from twelve to four inches in diameter," etc.

By section five it is provided: "Upon the completion of said works they shall be tested as to their power and capacity. When such works shall throw water with the aid of their pumping machinery from any six separate hydrants, located in the business part of said city, at one and the same time, one stream from each hydrant, through one hundred feet of two and a half inch hose and a one inch nozzle, ninety feet high, that at and from the completion of said test, if successful, the rental of fire service herein stipulated for shall begin."

There is a telephone of the company, used as a fire alarm under section seven, going from the telephone station to the

works. The city has never connected its fire alarm system with the pump house. Besides, at different parts of the city, the hydrostatic pressure varies, and hence mere notice of a fire does not indicate that there is an exigency which calls for direct pressure.

Section eleven provides: "The said company shall constantly, day and night, except in cases of unavoidable accident, keep all of said hydrants supplied with water for fire service, and shall keep them in good order and efficiency for that purpose." The chief of the fire department of said city shall inspect the hydrants from time to time, and, if found out of working order, he shall notify the chief officer of the company, in writing, specifying the hydrant or hydrants out of order, and the company shall forthwith repair the same, and, if not in working order in six days, the company shall pay a forfeit of ten dollars per week for each week such hydrant is out of order. The hydrants are to be used for the extinguishment of fires and for flushing only.

By section sixteen the right of way is granted "for the purpose of laying or extending their pipes . . . as may be necessary for proper distribution of water . . . so as to afford the most adequate supply for domestic use and the greatest protection against fire."

These are the only provisions of the contract pertinent to pressure. There is no charge in the bill that there is no sufficient supply. The capacities of the pumps are specified, and their capacity for work for domestic supply is stated, and "also to be able to work against one hundred and twenty-five pounds per square inch when necessary for fire protection. The pumps shall be so arranged that they may be worked singly or together, as required, furnishing direct pressure." The ability of the pumps is specified. "When necessary for fire protection, the pumps shall be so arranged that they may be worked singly or together, as required, furnishing direct pressure."

It is clear from this that it was contemplated that both

pumps need not be worked all the time, even for fire protection, but that, "as required" for fire protection, they shall be worked singly or together in furnishing direct pressure. The normal condition of the plant as to power was for domestic supply; then, in case of fire protection, it must have the capacity to be able to work against one hundred and twenty-five pounds per square inch "when necessary," and the pumps are to be so arranged that they can be worked singly or together, as required, in furnishing direct pressure.

Under this it is clear that if, when the plant was being used for domestic supply, and "when necessary" for fire protection stronger pressure was required, the pumps, singly or together, "as required," should develop one hundred and twenty-five pounds to the square inch. How is it to be known that such extraordinary pressure was required? Who is to determine "when" this pressure is "necessary?" Ordinarily, under the contract, it was contemplated that the domestic pressure would be sufficient. It was only "when necessary" that extra exertion was required. The fire department operates the fire extinguishing; the company has only to furnish water. How is the company to know, unless notice is given, that the exigency which calls for the extraordinary exertion of power has arisen? There is nothing said in the contract as to notice, except that the company is notified by its own employer, the telephone exchange, of the existence of fire. The contract calls for the exercise of this extra power only "when necessary," and the pumps are to be arranged to be operated singly or together, "as required," and we submit that it is the duty of the city to inform the company when it desires the extra power. The city, by its fire department, operates the supply. The company has nothing to do with the application of the supply to fire service. The city's employees hold the nozzles directing the supply, and are in the position to tell whether the power exercised is sufficient for the purpose, or whether the extra power, to be used only "when necessary," shall be required. The

fact of notice of the fire does not mean that direct pressure is necessary; the hydrostatic pressure is usually sufficient. If an exigency arises which the fire department, with its steam fire engines in use at the time the contract was made, cannot cope with, then the direct pressure was contemplated. Suppose nothing is said; no notice given to the water company. The fire is in the city, miles away from the source of the power of the plant. Could the city complain of a breach of the contract for failure to apply the extraordinary power which was only to be furnished "when necessary," without notice of the existence of the necessity to the company? So we submit that, if the machinery of the plant is of the capacity stated in section three, and able, "when necessary," to exert the power thereby prescribed for fire protection, by direct pressure, there could be no breach of the contract when no notice has been given to exert the extraordinary pressure there called for.

The test of capacity and power called for by section five was not intended to mark the normal workings of the plant. As a new machine, in its very best form, it was to be able to perform this test of its power and capacity. If it had the capacity and power to perform this test, then the rent was to commence. If I sell a horse, and guarantee him to trot a mile in 2:40, as a test of his power and capacity, I do not warrant that every hour of every day of the year he can make that test. The test is to determine the power and capacity of the plant. If its maximum strength is required to perform the test, it satisfies the terms of the contract. There is no guaranty that this test can or will be performed at any other time during the life of the contract. Section five is the crucial test for acceptance of the power and capacity. Section three prescribes the working or operating capacity or power of the plant. It directs how many pounds of pressure per square inch the pumps must be able, "when necessary," to work against. This power may be either more or less than that prescribed by section five. In either event that is the specified power re-

quired, and it must be exercised when necessary, whether, in effect, it produces more or less pressure than that necessary to perform the test. The specification of the size and power of the pumps themselves must govern as to the power of the plant. The covenant is, that the pumps shall furnish a specified amount of power for operation, and, that upon a test or trial, it would develop a certain result. A test is in no sense an ordinary rule of action but is "a decisive trial." The question this test was to decide was whether the works should be accepted—the criterion of acceptance. The working power to be developed after acceptance was "when necessary" for fire protection to be able to work against one hundred and twenty-five pounds per square inch. When the contractor who built the works for the company had performed that test, and had put in machinery of the capacity specified in section three, he had performed his contract, and when the city gave the certificate of acceptance provided by section five, the contractor had duly performed and the company was bound to pay him. He could not be held to have the acceptance of his performance annulled at any future date by any demand of a performance with section five as to a test. The test had been performed, the works accepted, and that acceptance could not be annulled by any future demands for tests. So, too, the company, after its contractor had performed this contract and had tendered it for acceptance, and the city had accepted it, paid the contract price and settled with the contractor. Now, if the status then fixed is not to continue, it would operate very harshly upon the company. After this test and acceptance, the city was estopped to deny the capacity of the plant and performance as to its physical aspects. *Farmers' Loan, etc., Co.* v. *Galesburg*, 133 U. S., 158.

So we insist that the extraordinary pressure called for by the contract was that of section three—viz., "to be able" "when necessary for fire protection." And as "to be able," "when necessary" and "as required," are both expressive

of conditions—*i. e.*, "to be able" "when necessary." means "to be able at such time as it may be necessary," and not that said power shall at all times be applied under all circumstances, and that without any indication of the necessity for such exercise, and that "as required" necessarily means that the requirement shall come from without, and that upon such requirement the act is to be done (*Wilson* v. *Charlotte*, 108 N. C., 523) —so, if no notice was given of the necessity for the extraordinary pressure by the city, there was no need of its exercise.

"Were water mains not less than four inches in diameter put down by direction of the city, or accepted by it after being put down, a performance of the contract by the company?"

"Where a main not less than four inches in diameter was put down, and accepted by the city, was it entitled, by the terms of the contract, to any better service of greater protection against fire than a main of that size, and pressure of the kind stipulated for in the contract, would give?"

"If the company put down mains where the city directed, and of the size directed or accepted by it as performance, can the city complain of want of sufficient protection against fire arising from this?"

These three questions can be discussed together.

Section one provides that the company will "provide and lay down, . . . through the principal streets of said city, for eight linear miles, . . . water mains of proper size and dimensions to supply all reasonable requirements of said city or its citizens for water, within twelve months from the execution of this contract, . . . and shall have and maintain at all times, . . . for the full period of twenty years from the commencement of the operations by its works; . . . a flow of . . . water through said mains, and shall, at eighty points on said mains, to be designated by the mayor of said city, . . . make proper openings and insert in such mains double fire hydrants of approved patterns, ten of which

shall also have a steamer nozzle, said nozzles to fit the hose now in the fire department of said city."

Section two: "The said water supply may be taken from streams; . . . such water to be pure, wholesome in quality, . . . and in quantity sufficient to meet the needs of said city and its inhabitants as far as the pipes herein mentioned and their extensions when ordered shall reach and as the growth of said city may render needful."

Section three, after specifying the power and capacity of the pumps, as stated *supra*, states: "All the machinery shall be increased from time to time as the growth of the city may render necessary. The mains shall be of iron pipe, varying in size from twelve to four inches in diameter, . . . and shall be tested at their place of manufacture . . . and shall be of ample size to carry out the provisions of this agreement and to afford the city where such pipes are laid first-class fire protection."

The fifth section provides for the test as shown *supra*.

By section six it is provided: "The said company may be required by the city, at any time, . . . to make extensions of the pipe system of said works, with hydrants placed thereon not less than three hundred nor more than four hundred feet apart, by giving thirty days' notice to said company, but, as a condition of making such extensions, the city agrees to pay rent for public fire service upon such extensions at the rate of $45 per annum for each hydrant."

Section eight provides "that said eighty fire hydrants, and such as may be placed on the extension of original mains as aforesaid, shall be used for fire purposes only, except . . . for flushing purposes and . . . for fire practice. . . . That said company, for said period of twenty years, shall supply, as aforesaid, water for all of said fire hydrants."

By section eleven, that said company "shall constantly . . . keep all of said hydrants supplied with water for fire service, and shall keep them in good order and efficiency for such purpose."

By section sixteen the right of way is granted over the streets of the city "for the purpose of laying or extending their pipes . . . as may be necessary for proper distribution of water throughout said city of Jackson as to afford the most adequate supply for domestic use and the greatest protection against fire."

By section nineteen, that before placing the mains the city shall establish the grade of the streets, and if by reason of any change of grade the city shall bear the expense of relaying the pipes.

As stated, these are all the parts of the contract pertinent to these questions. The size of the mains, ranging from twelve to four inches, was specified.

The original eight miles of mains were located by the city, and over such streets as the city elected to call "the principal streets of said city," under section one of the contract. The whole eight linear miles of mains were laid, and there was no objection then to sizes—all those laid coming within the requirements of from twelve to four inches.

There is not a single provision of the contract which contemplates a change of the mains as laid, except in case of change of grade of the street, in which case the city was to pay for relaying.

The system was that planned for the size of the city and its probable growth in twenty years. While under section two it is provided that the machinery shall be increased from time to time as the growth of the city may render necessary, the pipes themselves were, under the contract, esteemed to be large enough for any purpose for the term of the contract. By section two it is provided that the mains shall be in size ranging from twelve to four inches, shall be tested, etc., and shall be of ample size to carry out the provisions of this agreement and to afford the city, where laid, first-class fire protection. What is "ample size" was settled by the city directing the original eight miles of mains and accepting the plant as thus laid. The

city could not accept a performance of the contract in 1889 as to the size of mains and afterwards change its acceptance, in the absence of a reservation of the right in the contract. The size of pipe was accepted as a performance then; the city fixed what it thought was ample size for the different streets for first-class fire protection. Unlike the matter of machinery, there is no covenant that the pipes once laid and accepted shall be exhumed and changed during the continuance of the contract.

A municipality is as much bound as any other corporation by its acts where it has authority to act, and it may be bound not only by its express promises but also by its implied ones. It may also be estopped. See cases *supra. Farmers' Loan, etc., Co.* v. *Galesburg,* 133 U. S., 158.

The cost of the system was calculated when the hydrant rental was fixed, and the price was fixed with reference to the cost of the plant contemplated by the contract. If the city has the right to accept the plant as a performance of the contract, and then, at its caprice, refuse to perform because the size of the plant, either of its own direction or acceptance, is not deemed large enough, and to require another plant to be put in, then it would result that, while keeping the rentals fixed on the basis of a $100,000 plant, the city might require the old plant to be thrown away and a half million dollar plant put in instead. No such right was contemplated or given by the contract. The machinery, which embraces the pumps and boilers, comparatively inexpensive portions of the plant, and which are liable to wear out, is to be increased from time to time, as the growth of the city may render necessary. It was only in the matter of machinery that it was thought necessary to provide for enlargements, as that was to supply the power. So we submit that the size of the mains, after being laid, so remain during the period of the contract.

In respect to extensions, there is no provision that they are to be other than mere enlargements of the original plant under orders from the city. The city orders the extensions of the

mains; and could it be heard to complain, after it had ordered an extension, which was accepted as made in accordance with the order, that it was not of proper size?

So, with the original eight miles of mains from twelve to four inch, the city having designated the streets and having accepted the sizes as "ample," and with the extensions being ordered and accepted, it would hardly be a proper construction of the contract to say that the city could change the contract and require other sizes. In other words, that it could affirm and annul at will.

If we are correct in the view that the orders and acceptance of the mains fixed the status of the parties, then it follows, as a corollary, that these mains, be they large or small, would only be entitled to such pressure as the terms of the contract called for, as above set forth. The large mains would be put by the city in the thickly populated parts of the city, and the smaller mains in the outlying districts. The city must be charged with the knowledge of the fact that, with a given pressure at the pump house, that exerted in the mains would be proportioned to the length and size of the mains. The smaller the main, the less power would be developed, because of the friction of the water in the mains. In round numbers, the relative capacity of mains or circles is as the square of the diameter—thus, a twelve-inch main would have an effective force for transmitting water of one hundred and forty-four, and a four-inch of sixteen, a six-inch of thirty-six, and so on. Hence, by reason of friction, long four-inch mains will not furnish as much pressure as long six-inch mains. But there were to be only eight linear miles of all the different sizes from twelve to four-inch. Certainly four-inch were to be used at some places, and, hence, of necessity, would develop less pressure. So what pressure will be exerted at a given spot in the mains, depends (1) upon the power applied, (2) the size of the mains, (3) upon the length of the mains. As the city bargained for this particular power and these particular mains, it must fol-

low that only such pressure as these would produce would be what the city was entitled to at any particular point.

"Can the city complain of the want of the prescribed pressure, without showing that injury resulted from the failure of the company to furnish it, on application for it in a given case or cases?"

This question is cognate to the one first considered upon the terms of the contract, and wherein we showed that the extraordinary pressure was to be applied "when necessary" and "as required," and that this necessarily involved notice of the necessity. If the company was under no duty to supply this extraordinary pressure, except upon notice, then it would seem clear that, unless harm resulted when the company was at fault, there could be no ground of complaint.

*J. A. P. Campbell*, on the same side.

1. There is not in the statute any restriction on the power to contract for supplying the city with water. The grant is general, full and comprehensive, and authorized a contract to secure a supply to the city from year to year—that is, for a series of years—of water, an article of necessity always needed. The expression "from year to year" refers to "supplying," and not to the "contract" authorized. It denotes more than one, and carries the idea of duration and continuity. *Chadborn* v. *Green*, 9 Adol. & E., 233; 2 East, 309; Bacon's Abr. Lease, 623; *Webster* v. *Syracuse*, 17 N. Y., 110. This is the grammatical construction. It is the natural one, as shown by the view taken of it by all concerned. This interpretation is strengthened by the nature of the subject to which the grant of power relates, the known conditions under which the act was passed, the necessities it was intended to relieve, and as well by cotemporaneous legislation authorizing contracts for supplying the state and other municipalities with water, of equal duration with the one in question. Acts 1888, p. 468; Code 1892, § 2948.

2. No objection to the contract can be maintained on the ground of public policy, for the legislation of the state shows that twenty-five years was not regarded as too protracted a period for the duration of such contract, and that is the best and the authoritative expositor of public policy. Greenhood on Public Policy, p. 116. Time contracts of various kinds have been sustained against attack on this ground. *N. O. Gaslight Co.* v. *New Orleans*, 42 La. Ann., 188; *Capital City Water Co.* v. *Montgomery*, 92 Ala., 366, 367; *Waterworks Co.* v. *Atlantic City*, 48 N. J. L., 378; *Indianapolis* v. *Gas Co.*, 66 Ind., 396; *Valparaiso* v. *Gardner*, 97 Ind., 1; *Waterworks Co.* v. *Columbus*, 48 Kan., 99; *Fergus Water Co.* v. *City of Fergus Falls*, 65 Fed. Rep., 586; *Memphis* v. *Waterworks Co.*, 5 Heis., 495. Although no question of exclusive privilege is here involved, it may be stated that numerous cases sustain the grant of exclusive privileges for long series of years. *Newport* v. *Newport Light Co.*, 84 Ky., 166; *Quincy* v. *Bull*, 106 Ill., 337.

3. If the contract was invalid, certainly the municipal authorities could contract from year to year; and commencing the current year, receiving a supply of water, and paying for it for part of the year, binds the city for the year—the water contract year. . An implied contract may be made by a municipality as by an individual, where an express contract, or a particular mode of contracting, is not prescribed by law, and none was in this case. 1 Dillon on Mun. Corp., § 459, and note; *Montgomery* v. *Water Co.*, 79 Ala., 233, s.c. 77 Ala., 248. The hydrants were rented. On this ground this bill should be dismissed. It shows a new year begun, and, without offering to pay for the unexpired part of it, seeks rescission of the contract. The law of tenancy is too familiar to require citation of authorities.

4. A bill for cancellation or rescission is an appeal to the sound discretion of the court, and, when sustained, it is upon such terms as justice requires and the court imposes. Beach's

Eq. Jur., § 552; 7 Smed. & M., 768; 9 Smed. & M., 535; *Id.*, 596; 40 Miss., 507; 49 *Id.*, 582. See, also, 1 Smed. & M., 443. Rescission is not granted as readily as specific performance. *Hall* v. *Thompson*, 9 Smed. & M., 596. The party complained against must be injured as little as possible consistently with the rights of the complainant, and this rule has been enforced against public corporations in cases of void contracts. *Hitchcock* v. *Galveston*, 96 U. S., 341; *East St. Louis* v. *Gas Co.*, 98 Ill., 415; *Macon* v. *Huff*, 60 Ga., 221; *State Board* v. *Railway Co.*, 47 Ind., 407; Dillon on Mun. Corp.; *Schiffer* v. *Aurora*, 121 Ind., 154. So, if this contract was invalid, and rescinded, the question is, on what terms?

5. Unless the contract was invalid in its inception, there is no ground for rescission independently of the implied contract for the year begun. The bill is for rescission or cancellation, for invalidity, and for alleged breaches of the contract; and nothing is better settled in the jurisprudence of this state than that, to specifically perform or rescind, the party complained of must have been put in default by an offer to perform on the part of the complainant, and the *status quo* must be restored as nearly as possible, and, if it cannot be, ordinarily that is a bar to rescission. See our decisions on executory contracts between vendor and vendee, and 49 Miss., 582.

6. Was the extraordinary direct pressure contemplated and provided for by the contract, to be furnished in case of fire, without a call on the company for it by anyone in behalf of the city? This calls for an interpretation of clause three of the contract, in connection with all the other provisions it contains, and I think it must result in answering this inquiry in the negative. This part of the contract provides for an ordinary supply for domestic purposes, and for ability to exert a greater pressure mentioned, "when necessary for fire protection." This implies that it may not be always necessary, for fire protection, to employ this high pressure. Then, who is to determine its necessity and call for it? Is it for the city, or its fire

department spoken of in the contract or the water company? I maintain that, if the company was to be always provided with machinery able to work against the prescribed pressure, when necessary for fire protection, the company was to be advised of the necessity, and required to exert the prescribed pressure. The pumps were to be arranged so as to be worked singly or together, as required, furnishing direct pressure. Who was to require working together? It was evidently contemplated that ordinarily they would work singly or only one. The necessity for that was expected to arise occasionally, and when necessary, in the opinion of the city authorities, it was to be called for specially; otherwise, how could it be known? The utmost duty of the company was to furnish, at all times, the ordinary supply, and, in emergencies making it necessary, to respond to a call for the extraordinary.

7. Were mains not less than four inches in diameter, put down by direction of the city, or accepted by it after being put down, a performance of the contract by the company?

It seems clear that, as the whole matter of contracting for supplying the city was intrusted to the mayor and aldermen, as to the means of effecting the object in view, the size of the mains was determinable by them, and, where they directed the size beforehand, or accepted mains of a size within the limits of the contract, or even without those limits, the contract must be considered as performed. Certainly that would be true of an individual, and no different rule applies to a municipality empowered to contract. Mains not less than four inches in diameter nor greater than twelve inches were provided for, and it must have been for the city authorities to determine the size of mains required for different parts of the city, and where they directed or accepted mains, no complaint could afterwards be made of the company on this score; and, certainly, the size of mains accepted by the city authorities could not be ground for cancellation of the contract. That would be rank injustice, which no court can sanction. The prescribed test of capacity,

in clause five of the contract, is limited to the business part of the city, where the larger mains would be.

8. Where a main not less than four inches in diameter was accepted by the city, was it entitled by the contract to any better service or greater protection against fire than mains of that size and pressure of the kind stipulated for in the contract would give?

As the mayor and aldermen were intrusted, by law, with full power over the subject, as to the means of obtaining a supply of water, it appears to be clear that the city was not entitled to more than was bargained for; and if it contracted for a certain thing, as it did, and, in executing the contract made, adopted insufficient means for obtaining the end, it must abide by its own action, and cannot justly complain of the result; and, certainly, is not entitled to a cancellation of its contract on the ground that it had erred in its estimate of what was necessary.

And this answers the question, if the company put down mains where the city directed, and of the size directed or accepted by it as performance of the contract, can the city complain of want of sufficient "fire protection" arising from this?

The company was bound by the contract to have machinery able to exert certain power prescribed, and to have hydrants and keep them supplied with water for fire service, and in good order and efficiency for that purpose, but if the city accepted four-inch mains, it could not expect or require better service than the means provided would afford. That must be manifest, I think.

9. Can the city complain of the want of the prescribed pressure, without showing that harm resulted from failure of the company to furnish it, when called on, in a given case or cases? I have already descanted on the right of the company to be called on for the extraordinary power necessary in case of fire. This query involves the proposition that mere failure to be able at any time to exert the prescribed power was harmless, and no ground of complaint, if no harm resulted; and the further prop-

osition that the bill should aver, not only failure and harm resulting therefrom, but should particularize, and give the defendant notice of the instances complained of, and not stop with a vague general charge of breach of the contract. What difference did it make that at times the machinery was not able to come up to the prescribed standard of ability, if there was no occasion for it and no harm was done? It would be *damnum absque injuria* at most, and no ground for rescission, certainly. There is not in the contract any specific provision for furnishing direct pressure in case of fire. Inferentially, it may be claimed that the contemplation was that it should be furnished, when necessary, for "fire protection," but it is no more than an inference that it should be. The works were to be equal to certain pressure, and the hydrants kept supplied with water "for fire service," and "in good order and efficiency for such purpose," but there is no stipulation for extraordinary capacity, except to be able to work against prescribed pressure, etc., to be capable, when tested, of throwing streams a certain height in the business part of the city. The consequence of hydrants being out of order was agreed on between the parties, and, as to that breach, the city is confined to the remedy it contracted for, and only that, as I have endeavored to show *infra.* No provision was made, expressly, for direct pressure, and, therefore, no measure of redress for that was embraced in the contract. I grant that it may be plausibly contended that direct pressure was contemplated, "when necessary for fire protection," but as a maximum of ability was stipulated for in the machinery, and that was to be used only when necessary in case of fire, and, as the whole power might not be necessary for fire protection, not only was the company to be called on and informed of the necessity for direct pressure, and how much, but that if it was at any time unable to respond to a demand for direct pressure, and there was no harm from it, because no occasion for it, no complaint can be made. As direct pressure was contemplated only when necessary for fire protection and

to the extent of the necessity, and as the company was relieved in case of unavoidable accident, it is but proper that it should be specifically informed of the particular instances of failure complained of, in order to defend itself as it may.

10. Can rescission be demanded without complaint having been made of the failure, and opportunity given to rectify the wrong complained of?

Where breach of a contract is relied on as ground for rescission, notice of defects complained of should be given and opportunity afforded to correct them. *Winfield* v. *Water Co.*, 51 Kan., 70. Fairness on the part of the complainant seeking rescission is required. *Ayres* v. *Mitchell*, 3 Smed. & M., 683. Defendant must have been put in default. *Ib.*

The supply of water for fire service was specifically provided for by clause eleven of the contract, which fixes a penalty for failure to keep the hydrants supplied with water, and in good order and efficiency. It provides for notice to the company and forfeiture for continued insufficiency. The parties thus prescribed the consequence of a breach as to this matter, after notice, and failure to remedy the evil. Surely the city is not entitled to rescission as respects this. The supreme court of North Carolina refused rescission in a similar case. *Wilson, Colston Co.* v. *Charlotte*, 108 N. C., 121. The parties agreed upon the consequence of any such breach as mentioned, and should be held to their own measure of damages (liquidated).

11. It may be fairly argued that this prescribing a penalty for failure to keep the public hydrants supplied with water and in good order and efficiency was designed, and had the effect, to cover the case of failure of the stipulated pressure, when necessary, in case of fire. A supply of water and good order and efficiency in the hydrants were conditions without which the prescribed power in the machinery would be ineffective. The several parts constitute the whole system and the hydrants are the discharge pipes merely through which water is obtained from the mains, and the supply of water to them,

and the good order and efficiency in them provided for embrace the whole subject of "fire service," The pressure would be useless without the mains and hydrants, and the good order and efficiency of the hydrants consist in the supply of water, and power to throw it in streams from them, when required. It is true the eleventh clause of the contract, which fixes the penalty mentioned, treats hydrants as distinct things from "pressure" or power in the machinery, and speaks of hydrants separately; but, if thus applied, the contract may be searched in vain for any obligation imposed on the company, by express provision, to furnish direct pressure in case of fire. There is provision for machinery of certain capacity and "to be able to work" in a certain way, "when necessary for fire protection;" and "the pumps shall be so arranged that they may be worked singly or together, as required, furnishing direct pressure" (third clause); and a test of capacity was stipulated for which, being successful, "the rental for fire service . . . shall begin" (clause five); but nowhere can be found any stipulation for "direct pressure." Various expressions suggest that it was contemplated and intended to be provided for, but was not, in terms. Certain capacity in the machinery was stipulated for, and pumps to be so arranged as to be worked singly or doubly, furnishing direct pressure, a test was to be applied to show capacity in the business part of the city, mains and hydrants were provided for, and it was stipulated "that said company, for said period of twenty years, shall supply as aforesaid (?) water for all of said fire hydrants," etc., (clause eight).

It is difficult to determine to what "aforesaid" refers. It relates to the manner of supplying, and nothing had been "said before" on that subject, except to provide for the source of supply and power of machinery, and mains and hydrants; and, unless an obligation to furnish direct pressure can be deduced from what has been mentioned, it does not exist.

If the eleventh clause of the contract be added to strengthen

the inference of obligation to furnish "direct pressure, when necessary for fire protection," the question is suggested, why, if direct pressure was understood to be stipulated for, was not a penalty prescribed for breach of that? The answer must be that, having secured the machinery and appliances deemed necessary, and tested them satisfactorily, no more was necessary; or else, that the all-important thing was the supply of water for the hydrants and their good order and efficiency, which included the requisite pressure, and, therefore, the penalty prescribed for hydrants being out of working order, one or all (which was a breach of the obligation to furnish direct pressure), was to be imposed as means of securing what was stipulated for in this respect. The sound view appears to me to be that direct pressure was not provided for; that it was assumed that, with capacity for it at the start, it would continue, or that this feature was lost sight of and no stipulation about it made, and that the condition of the hydrants and their efficiency was all that it was thought necessary to secure by a prescribed penalty. The eleventh clause of the contract has no reference to direct pressure. That was to be furnished (if at all) only when necessary for fire protection. It was for an emergency, and when required, but this clause has reference to a constant supply, day and night, of all of said hydrants "with water for fire service." The obligation to furnish direct pressure must be found elsewhere (if it exists) than in the eleventh clause, which refers to a totally different thing—the ordinary supply. There is certainly no express stipulation for direct pressure, and if an obligation rests on the company for it, in certain emergencies, it is by inference that it arises. Hydrostatic pressure other than direct was evidently relied on as sufficient, ordinarily, and that was provided for constantly, and reliance was placed on that as sufficient, and hence the stipulation for a penalty for hydrants (one or more) being out of working order, and no provision was made either for furnishing direct pressure or for a forfeiture for failing to furnish it. Ability to

furnish it was provided for, but there is no stipulation for furnishing it.

It may be safely affirmed, at all events, that it is extremely doubtful whether the contract imposes any obligation for furnishing direct pressure.  It stipulates for ability to furnish it in case of need, and omits to require it; and if an obligation existed to furnish it when necessary, certainly fairness requires that notice of the emergency should be given to the company, and not to devolve on it, at its peril, to decide if more than usual supply of pressure is necessary in a given case.  Perhaps the true view is that, as the test of capacity prescribed as the criterion by the fifth clause was to throw water in a certain way through the hydrants in the business part of the city, the ability to do this was all that was required, and there is no charge of incapacity to do this.  Such power was not deemed necessary elsewhere, or its existence there was considered a guaranty of what was necessary elsewhere.  There is no averment of want of ability to throw water according to the test in the business part of the city.  It was assumed that capacity of the machinery to throw water through six hydrants at once, ninety feet high, in the business part of the city, according to the prescribed test, would assure sufficient pressure for other parts of the city where smaller mains would be used, and, therefore, the test of capacity was confined to the business part of the city.

This is a most reasonable view, and accounts for the absence of any specific stipulation as to other parts of the city or providing a forfeiture for failure of pressure.  Want of necessary power would be complete failure.  Disorder in a few hydrants would be partial and local and admit of delay, while lack of power might be fatal, and would be certainly to the extent of failure.

This seems, on a full review, the most rational interpretation of the contract, and it is probable that the whole difficulty as to want of power has arisen from mains adopted being too small, resulting in disappointment as to the stream thrown in

some cases.   The bill does not give particulars, and is insufficient in this respect.   Manifestly, the proof of capacity as required, agreed on as a criterion, was the successful performance of the prescribed test in the business part of the city, and there is no averment in the bill that, at any time, this test could not be met.   There is a vague charge of failure some time and somewhere to throw a sufficient stream, but it is not improbable that such failure arose from something else than want of the prescribed power.   Perhaps, on the day and hour when the prescribed test (proof of capacity) was successfully met, the very same insufficiency of stream thrown through a four-inch pipe, at a remote point, and in an unfavorable situation, would have been exhibited.

My proposition is, that the bill does not show a breach of the contract for direct pressure, if there is one, because it fails to aver incapacity to meet the prescribed test at any time, and complains in this regard only of what it assumes as failure, because of what is not proof of such incapacity.   Incapacity consists in inability to conform to the prescribed test, and that is not averred, but something insufficient to prove such incapacity.   There should be a direct charge of want of ability and not merely an averment of something assumed as a consequence of want of ability.   To show a breach of the contract for want of capacity in the machinery (whatever be the test), it should be averred that there was want of capacity, from defective machinery or failure to apply it, and not the mere statement of consequences which may not be properly attributed to that.

If the bill does not show a breach of the contract as to direct pressure or requisite capacity of machinery, and if the parties, having agreed on the forfeiture or penalty for hydrants out of working order, are confined to their agreement as to these, the bill must fail as to these matters.   It does not negative the fact that the failure of sufficient streams of water in the unnamed instances of failure did not arise from hydrants being out of order; and, if that was the cause, the city must look to

the agreed remedy for that, and cannot obtain cancellation for that.

Note that the city did not contract generally for a supply of water and protection against fire, but prescribed details, and the company is not an insurer of protection but stipulated for certain things required by the city for this end, and is bound only according to its obligation; and, if the result is not what the city expected, the company is not to bear the consequences. It stands upon the contract, while ever ready to meet the city authorities in a spirit of fairness, to adjust differences and meet all reasonable demands.

*Williamson & Potter,* for appellee.

Chapter 178, acts 1888, was a special law, applicable only to the city of Jackson, and conferred upon its mayor and board of aldermen the power and authority to make a water contract from year to year, without submitting the question to the qualified voters of the city, as was required by chapter 385, embracing all municipalities. That this law limited the power of the city authorities to a contract for one year, is shown not only by the language used in the statute, but also by the contemporaneous legislation dealing with the subject of water contracts by municipalities.

Prior to 1888 the city of Jackson had no authority to contract for water or waterworks, except that which might be implied from its general powers to contract and to preserve the public health, contained in its charter. In that year the legislature undertook specifically to deal with the question. It passed the aforementioned general law, raising a commission to contract for supply of water to the state institutions and public buildings, for a series of years not to exceed twenty-five, and provided in the same act that municipal authorities might make similar contracts for a like period, if such a contract should be indorsed by two-thirds of the qualified voters, upon the submission of the same to them. In the consideration

and passage of the local or special law, providing for the sale of College Green and the building of a public school, this same legislature, knowing the power given to all cities, Jackson included, to make contracts for a series of years for water supply by vote of the people, but seeming to appreciate the fact that a contingency might arise where the city would need water for her school and other buildings, grants the authority and power to the mayor and board of aldermen, without requiring the indorsement of the qualified electors, but is careful to restrict the duration of the contract thus made independently by the mayor and board of aldermen, and requires that it should be from year to year. Not only does the contemporaneous legislation on the subject of water contracts by municipalities indicate the intention of the legislature to restrict to one year contracts made by the mayor and board of aldermen of Jackson, without a vote of the people, but, in our judgment, the very language of the statute will not reasonably bear any other construction.

The words "from year to year" mean something. The legislature was not engaged in an idle ceremony when they inserted these words, and it was not done as a mere rhetorical flourish. The phrase is qualifying in its effect, and limits the import of some word in the sentence. Counsel for appellant contend that these words refer to and qualify the participle supplying, and that the legislature meant by the sentence to say that the city authorities might contract for any number of years for the sup plying of water from year to year, while we contend that authority is granted to contract from year to year for the supplying of water to the city and its inhabitants.

It is difficult to find authorities giving a definite legal meaning to the phrase "from year to year." But whenever the courts have construed it, it has been held to mean annually, year by year, once in each year. We find it in decisions where the courts have construed statutes providing for the levy of taxes from year to year to raise funds for certain purposes.

See *Atlantic City Water Co.* v. *Atlantic City*, 15 Am. & Eng. Cor. Cases, p. 327. In this case the statute provided that taxes should be levied from year to year, and it was held that there should be an annual levy of the taxes—that is, once every year. Will it be contended that, where the statute provided for the issuance of bonds to run twenty years, and that taxes should be levied from year to year to pay the interest and raise a sinking fund, the authorities could, at the beginning of the term, make a levy that would last for the whole twenty years without further action by the taxing power? Clearly not. There would have to be a levy once in each year, and would last only for the year succeeding the levy. What would be the difference if the statute provided for the issuance of the bonds bearing interest and should then provide " that the authorities should have power to levy taxes for paying the interest and raising a sinking fund on said bonds from year to year? No court would hold that one levy could be made to cover the whole period of twenty years, but there would have to be annually a levy of the tax, a paying of the interest and a raising of a sinking fund. Would a law which authorized the steward of the lunatic asylum to contract with any reliable market man for supplying that institution with good and wholesome meat from year to year be construed by this court to grant him authority to make a contract for a period of twenty years binding the trustees of that institution to pay the prices fixed in the contract for that length of time?

If, then, we are right in our contention that the words " from year to year " mean annually, and that they qualify and limit the contracting power conferred by the law on the mayor and board of aldermen, the contract set out in this record is *ultra vires* and void. *Alton* v. *Ætna Ins. Co.*, 82 Ill., 45; Am. & Eng. Cor. Cases, vol. 20, 270 to 278; *Leonard* v. *Canton*, 35 Miss., 189; *Keeney* v. *Jersey City*, 47 N. J. L., 449; *Bonestell* v. *Mayor New York*, 22 N. Y., 162; *First Pres. Church* v. *Fort Wayne*, 36 Ind., 338; *Supervisors* v. *Arrighi*, 54

Miss., 668; *State* v. *Harrison,* vol. 5, Am. & Eng. Cor. Cases, 446; *Waterworks Co.* v. *Greenville* (Miss., 1890), 7 South. Reporter, 409; *Farmers' Loan & Trust Co.* v. *Galesburg,* 133 U. S., 158; *Waterworks Co.* v. *Winfield,* 51 Kan., 104; Am. & Eng. Enc. L., vol. 15, 1100; 59 Mich., 311.

A city council cannot bind the municipal corporation by any act which transcends their lawful powers. See 39 Miss., 671; Am. & Eng. Enc. L., vol. 15, 1101, note 1, and authorities there cited.

A person dealing with a corporation is charged with knowledge of the nature of the duties and of the extent of the powers of the municipal authorities to make contract under the charter. See 15 Am. & Eng. Enc. L., 1100, § 6, note 2, and the authorities there cited; *Para* v. *Greenbach,* 72 N. Y., 464.

It is the policy of the law to require of municipal authorities a strict compliance with, and observance of, their powers. Any doubt or ambiguity arising out of the terms used by the legislature in making a grant of power, must be resolved in favor of the public, and a power cannot be exercised where it is not clearly comprehended within the words of the act. See *Grand Rapids Co.* v. *Grand Rapids,* Am. & Eng. Cor. Cases, vol. 20, 270; Am. & Eng. Enc. L., vol. 15, 1041, § 2, note 2, and authorities there cited.

The mayor and aldermen having exceeded their powers in making the water contract for the city, it is absolutely void, and all proceedings under it are null. It cannot be enforced by either party to the contract. *State* v. *Harrison,* 46 N. J. L., 79.

The contract being *ultra vires,* null and void, it should be now rescinded and canceled. The fact that it has been executed by the parties for a number of years, cannot affect the right of the city to have it annulled. *Town of Durango* v. *Pennington,* 8 Colo., 257; 7 Am. & Eng. Cor. Cases, 588; *Milford* v. *Milford Water Co.,* 124 Penn. St., 610; 15 Am. & Eng. Enc. L., 1105.

As to the terms of the rescission of the contract, the city, at the time the bill was filed to rescind and annul the contract, had paid for the water up to act 1895.  The city had kept her part of the void contract in all respects, while the waterworks company had not.  The contract ought to be unconditionally annulled as to the city.  *Farmers' Loan & Trust Co.* v. *Galesburg*, 133 U. S., 9, 158; *Waterworks Co.* v. *Winfield*, 51 Kan., 104.

But we say that if this contract was not *ultra vires* and void, it has not been complied with by the water company, and it ought to be annulled for this failure.  The fact that the city accepted the waterworks under the test stipulated for in the contract, and accepted the extensions made by the water company, does not bind the city, if the water company thereafter failed to comply with the stipulations in the contract as to mains, pipes, pressure for fire purposes, and the quantity and quality of the water to be supplied.  See *Farmers' Loan & Trust Co.* v. *Galesburg*, 133 U. S., 158.

The contract binds the water company to "lay down eight linear miles  .  .  .  of water mains of proper size and dimensions to supply all reasonable requirements of said city or its inhabitants for water."  See section one of contract.

Section two requires that the water shall be "in quantities sufficient to meet the needs of the said city and its inhabitants as far as the pipes herein mentioned and their extension, when ordered, shall reach, and the growth of the city may render needful."

Section three requires the works to be complete and perfect in all details, provides what the machinery shall consist of and the pressure that shall be given ordinarily, and that the machinery shall be "able to work against 125 pounds per square inch pressure when necessary for fire protection, and direct pressure shall be furnished.  The machinery shall be increased from time to time as the growth of the city may require.  The mains or pipes shall be of iron, ranging in size from four to

twelve inches in diameter, etc., . . . and shall be of ample size to carry out the provisions of this agreement and to afford the city, where such pipes are laid, first-class fire protection.''

Section eleven: '' Said company shall constantly, day and night, except in cases of unavoidable accident, keep all the hydrants supplied with water for fire service, and shall keep them in good order and efficiency for such purpose.''

Section seven requires the water company to provide an electric fire alarm bell and telephone, to be used as a fire alarm.

The contract, therefore, binds the company to furnish sufficient water and pressure enough, at all times, night and day, to give first-class fire protection. They are entitled to no more notice or call on them for the pressure than this fire alarm for which the contract provides. They have always had that notice, but counsel insist they should be notified officially, in some way, that the pressure is needed. The alarm of fire is all the notice contemplated by the contract, or required by law, to bind the company to furnish the pressure. The company must be ready at a moment's notice, by the alarm of fire, to put on the extraordinary pressure. Surely it will not be required that some particular officer of the city shall hunt up and notify some officer of the water company that the pressure is needed, when a fire breaks out in the city. The town might be consumed by the flames before either officer could be found to give formal notice.

The putting down of four, six or eight-inch mains was not a compliance of the contract if that size pipes did not furnish the fire protection stipulated for in the contract. They should have put down all twelve-inch pipes, if that size was necessary to give first-class fire protection, and to furnish sufficient water for the city and its inhabitants.

The city is entitled, under the contract, to first-class fire protection and a supply of water sufficient for its needs and that of the inhabitants, and if the company put down four or six-

inch pipes, which would not give this protection against fire and sufficiency of water, it is not a compliance, although the council of the city may have accepted the works on the test. See *Farmers' Loan & Trust Co.* v. *Galesburg,* 133 U. S., 158.

The city has been indulgent. It has waited seven years, and paid the hydrant rents, while the waterworks company have as constantly failed to give the necessary pressure or the sufficiency of water.

The demurrer was properly overruled by the chancery court.

Argued orally by *J. A. P. Campbell,* for the appellant, and by *C. M. Williamson,* for the appellee.

COOPER, C. J., delivered the opinion of the court.

In view of the nature and character of the subject-matter of the contract which the board of mayor and aldermen of the city of Jackson was authorized to make by the third section of the act of February 29, 1888, we think the contract entered into with the appellant was within the delegation of power, so far as the time of its duration is involved. The language of the act is ''that the said board of mayor and aldermen be, and they are hereby, authorized and empowered to contract with any reliable corporation, association or individual, for supplying the said city of Jackson with water and electric or gas lights, from year to year, and to levy and collect a tax necessary to discharge the debt in that behalf contracted by them.''

We know that the machinery, mains and appliances required for supplying the city with water are costly to begin with, and of relatively little value if removed when once located. Permanency of the plant is essential to the realization of any profit in the enterprise, and in cities having no greater population than that of Jackson, the use of water for municipal purposes would probably be a prerequisite to secure the investment of the capital necessary to the construction of the plant. The words from ''year to year,'' relied upon by the appellee as limiting the

power of the officers of the city to the making of the annual contracts, derive much of their significance from the subject and nature of the thing contracted for, the character of the body on which the power is conferred, the end to the attainment of which the power is to be exercised, and the extent to which such powers for such purposes are usually conferred.

A few days before the passage of the act of February 29, 1888, the legislature had incorporated the water company and conferred upon it the right to lay its mains in the streets of Jackson. A few days after the act was passed, a commission was appointed by the legislature to contract for water for the state institutions, situated in and near the city, for the term of twenty-five years. In this act power was conferred upon all municipalities to enter into contracts, for a term not exceeding twenty-five years, for supplies of water, on a two-thirds affirmative vote of the qualified electors, but the act provided that it should not apply to municipalities whose charters already conferred the power of making contracts for water. The act of February 29, is, in its nature, though not in its terms, an amendment of the city charter. It deals wholly with municipal affairs, and confers powers upon the officers of the city, and a charter is but a grant of power.

In view of the interests involved, counsel for the city and the water company entered into a written stipulation, by which it was agreed that certain questions not properly presented by the demurrer should be submitted to the court, and others which might be decided should be considered as withheld for decision upon final hearing of the cause. The purpose of the agreement is to have an authoritative construction of the contract, to the end that the course of the litigation may be directed unless a satisfactory adjustment of the matters in dispute can be made. Without taking up *seriatim* the various questions propounded, they will be found to be solvable by the following general announcement of our construction of the contract:

The end and purpose of the contract was that the city and its

inhabitants were to be supplied with water, for domestic and public purposes, including "first-class fire protection." But this protection, in case of fire, was to be such as might be afforded within the territory covered by the "eight linear miles" of mains contracted for, by water forced by "two separate and distinct pumps, with suitable boilers, and other attachments, capable of pumping two millions of gallons of water in twenty-four hours against a pressure equivalent to at least a pressure of one hundred and fifteen feet head, at a piston speed not greater than one hundred and twenty feet per minute, for domestic supply; also, able to work against one hundred and twenty-five pounds per square inch pressure, when necessary for fire protection," the water passing through mains of the kind and quality stipulated for, and of diameter not exceeding twelve inches. For territory not covered by the eight miles first contracted for, the machinery was to be from time to time increased in size, as the extension of the mains should be made, in order that the same protection afforded within the first eight miles might be supplied to such additional territory. But if with smaller mains "first-class fire protection" could be afforded to all parts of the city, mains of greater sizes than were necessary for such purpose were not to be required. The city contracted for results, and not for the mains or appliances by which such results should be reached, except that the quantity and force of the water should not be required to exceed the quantity which could be supplied by the maximum of power exerted against the minimum of resistance, in the named territory, by the use of the named pumps and mains. If the water company put down mains of smaller size than the maximum stipulated for in the contract, acceptance thereof by the city would not relieve the company from supplying the stipulated quantity and force of water named in the contract. The city stipulated, as we have said, for results and not for mains or machinery. The mains, when put down, do not become the property of the city. They remain the property of the com-

pany, whatever may be their size, so that they be not less than
four inches in diameter.   All the city can claim is that ma-
chinery of sufficient power shall be used to supply the quantity
and power of water named in the contract.   But the company
stipulated to supply a certain fixed power, and mains of "ample
size to carry out the provisions of this agreement, and to afford
the city, when such pipes are laid, first-class fire protection."
This clause of the contract must, of course, be read in the light
of other provisions, by which it is provided that the mains shall
not be required to exceed the greatest size stipulated for—
twelve inches.   The contract of the company is a continuing
one, and the duty of supplying water according to its terms
must be met and discharged.   Its officers know, or ought to
know, far better than the city authorities, what machinery and
mains are requisite to the due execution of the contract, and
the failure of the city authorities to take exception to the size
of the mains does not relieve the company from meeting its
obligation according to its agreement.

The remedy of rescission, which the courts are reluctant to
afford when adequate damages for breach of contract may be
recovered at law, is peculiarly appropriate in cases of this char-
acter.   What the city contracted for was a constant supply of
water for the protection of the property of its citizens against
fire.   A failure to afford such supply would result in no injury
if no fire occurred, but to say that, because no damage has been
sustained, no right, either of an action at law, or in equity for
rescission, can be maintained, would hazard the security of the
inhabitants, and leave without sufficient remedy the perpetu-
ation of the very danger to avoid which large outlays of pub-
lic money have been made for years.

In *Farmers' Loan & Trust Co.* v. *Galesburg*, 133 U. S., 156,
the supreme court of the United States, speaking of the remedy
of rescission in a case of this character, said:  "But it seems to
us that, in respect to a contract of the character of the present
one, the ability of the water company to continue to furnish

water according to the terms of the ordinance was a condition precedent to the continuing right of Shelton and his assigns to use the streets of the city and to furnish water for a period of thirty years, and that when, after a reasonable time, Shelton and his assigns had failed to comply with the condition as to quantity and quality of the water, the city had a right to treat the contract as terminated, and to invoke the aid of a court of equity to enforce its rescission.   A suit for the specific performance of the contract, or a suit to recover damages for its nonperformance, would be a wholly inadequate remedy in a case like the present.   The danger to the health and lives of the inhabitants of the city from impure water, and the continued exposure of the property in the city to destruction by fire from an inadequate supply of water, were public questions peculiarly under the care of the municipality, and it was entitled and bound to act with the highest regard for the public interests, and at the same time, as it did, with due consideration for the rights of the other parties to the contract.''

It remains but to add that the test prescribed by the fifth section of the contract was intended only to determine the time at which the rental of the fire hydrants should begin, and that the penalty prescribed by section eleven was not in the nature of liquidated damages for the entire breach of the contract, but a penalty for the occasional and temporary neglect on the part of the company to keep all or any of the hydrants in proper repair.   The question whether the company must take notice of all fires occurring in the town, or is entitled to notice and a demand for direct pressure from its pumps, is answered by the statement that this would depend upon the circumstances and extent of the fire.   The burning of a small building in a remote part of the city might be unknown to the employees of the company as well as the fire department of the town, and negligence of duty would not be predicable of the failure to put on the pressure in such case.   But the company must take notice of such fires as it would be negligence not to know of, in

view of its duty, its opportunities of information and the nature of its business. It is not entitled to a formal demand for direct pressure. That must be supplied, by the terms of the contract, when and so often as the necessity therefor arises. The breach of contract for which rescission should be decreed must be one not occasional and immaterial only, but one going to the very substance of the contract.

*The decree is affirmed.*