507 So.2d 63 (1987)
FUSELIER, OTT & McKEE, P.A., Louis A. Fuselier, Emile C. Ott, and M. Curtiss McKee
v.
Armin J. MOELLER, Jr.
No. 55751.
Supreme Court of Mississippi.
April 15, 1987.
Rehearing Denied June 3, 1987.
*65 David W. Dogan, III, Charles L. Brocato, Heidelberg, Woodliff & Franks, Charles L. Brocato, Magruder, Montgomery, Brocato & Hosemann, Jackson, for appellant.
C. York Craig, Jr., Neville H. Boschert, Watkins, Ludlam & Stennis, Jackson, for appellee.
Before ROY NOBLE LEE, P.J., and ROBERTSON and GRIFFIN, JJ.
GRIFFIN, Justice, for the Court:
This case, concerning an employment contract, comes to the Court from the Chancery Court of the First Judicial District of Hinds County, Mississippi. The chancellor, sitting by special designation, entered a judgment for the appellee, Armin J. Moeller, Jr., in the amount of $150,413.66. We affirm in part and reverse in part.
On March 1, 1975, Armin Moeller began work with the labor law firm of Fuselier, Ott, McKee & Flowers. At this time, members of the firm told Moeller that, upon satisfactory performance, a partnership interest would be available in three years.
Delayed due to the partnership's incorporation, the firm offered Moeller four hundred shares of stock in the professional association, representing an ownership interest of somewhat less than 7.5%, during the Summer of 1978. To cover the purchase price of $16,880, Moeller borrowed funds from a Jackson bank. As a stockholder, Moeller was to receive the following benefits, documented at the time of the purchase: (1) a voice in the firm as a stockholder, (2) a recognized stake in the firm's success, (3) improved profit sharing, (4) trips to the A.B.A. Convention and Mid-Winter Meeting, (5) $8,694 in hard assets, (6) disability income with supplemental salary, and (7) $50,000 in life insurance with supplemental salary.
Consistent with his status as a stockholder, Moeller also became a contract employee of the firm. On August 1, 1978, he executed an Employment Agreement, which read in part:
11. Termination of Employment:

The Association may terminate this agreement without cause and at any time upon sixty days prior written notice to Employee and the Association shall only be obligated to continue to pay Employee the salary due him under this agreement up to the date of termination. Employee may terminate this agreement at any time upon sixty days prior written notice to the Association and the Association shall be obligated only to continue to pay Employee his said salary up to the date of termination. (emphasis added)
Throughout 1979 and 1980, discussions occurred within the firm concerning future stock purchases. Specifically, Moeller objected to the "serious problems" that he had encountered borrowing money at a high rate of interest. Since the stock's price was tied directly to the firm's annual billings, he also feared that, with inflation, its cost would become prohibitive. It was during this time that Moeller signed a second contract, called a Stock Redemption Agreement, providing:
2. Involuntary Termination.

a. In the event that a shareholder is involuntarily terminated by action of the Board of Directors or the Shareholders, his stock shall be immediately *66 redeemed by the Association. If the shareholder is involuntarily terminated within the space of twelve (12) months from the date that he initially became a shareholder in the Association, such shares shall be redeemed by the Association by paying to the terminated shareholder the entire purchase price paid by him for the share of stock which he initially purchased. All shares owned by a shareholder involuntarily terminated after the initial twelve (12) months period of being a shareholder shall be redeemed by the Association at seventy-five percent (75%) book value (on the accrual basis in conformity with generally accepted accounting principles) existing on the date of termination.
By the Fall of 1981, it was obvious that Moeller's views concerning the transfer of majority ownership to himself and other junior partners, differed substantially from those of the senior partners. As a result, relations within the firm soured, destroying morale, until the situation became "intolerable."
On March 31, 1982, the firm acted, delivering to Moeller the following letter:
Dear Armin:
Pursuant to your employment agreement with Fuselier, Ott, McKee & Moeller, P.A., your employment is herewith terminated effective May 30, 1982.
The Association herewith exercises its rights of redemption over your shares of stock in the Association pursuant to the Stock Redemption Agreement.
 Yours truly,
 Fuselier, Ott, McKee
 & Moeller, P.A.
Moreover, Moeller was told to leave the office immediately, surrendering all firm property. He was not to return to the office for personal effects without permission. Later that afternoon, the firm changed the locks on the office door. As a result, Moeller suffered an acute emotional response.
At trial, the chancellor awarded Moeller $150,413.66, for breach of the Employment Agreement and the Stock Redemption Agreement, basing the latter upon a finding that the two contracts were so "intertwined" as to be the equivalent of a single accord, and for the tortious nature of the appellants' acts. An itemized list of damages includes the following:

I. Actual Damages for Breach of the Employment Agreement and the Stock
 Redemption Agreement
A. Two months' salary at $4,583.33 per month $ 9,166.66
B. Five weeks' accrued vacation 5,288.00
C. Price of Moeller's Stock 16,880.00
D. Interest paid by Moeller to purchase stock 8,778.00
E. Moeller's share of undistributed $28,000.00 profit 4,500.00
F. Loss of 30% uninvested portion of pension and
 profit-sharing plan 3,111.00
G. Pension and profit-sharing contribution which was to have
 been made for fiscal year ending 2/28/83 6,400.00
H. Trips to ABA Convention and Mid-Winter Meeting 8,700.00
I. 10% assessed value of Moeller's stock for failure to allow
 Moeller access to corporate books and records 1,688.00
J. Expense of relocating 402.00
 _________
 $64,913.66
II. Damages for the Tortious Breach of Contract and the Tortious
 Interference with Business Relationships
A. Punitive damages $10,000.00
B. Attorney's fees and expenses incurred by attorneys 51,000.00
C. Loss of income suffered by Moeller 12,000.00
D. Damages for mental anguish, emotional distress,
 humiliation and mental anxiety 20,000.00
 _________
 $93,000.00

These amount to a sum of $157,913.66, minus $7,500.00 owed to the firm by Moeller, reflecting a promissory note and advance.

I.

CONTRACT DAMAGES
The appellants first contend that Moeller's termination failed to breach the terms of his Employment Agreement, which specifically provided that the Association's only obligation to Moeller, upon involuntary termination, was payment of his *67 salary for the notice period. They deny that Moeller's termination preceded the expiration of the sixty days' notice period, pointing to the termination letter itself, which lists May 30, 1982, as the effective date.
Yet, the chancellor found that the effective date of termination was March 31, 1982, when the firm locked Moeller out of his office. Clearly, there is substantial evidence in the record to support the chancellor's finding. For example, immediately following March 31, 1982, the firm denied Moeller ready access to his office, refused him secretarial assistance, and dropped his name from the firm's sign as well as from the receptionist's identification of the firm over the telephone.
Moreover, the firm refused to pay Moeller his salary for the sixty days' notice period, as provided by the terms of the Employment Agreement. 9 Williston, A Treatise on the Law of Contracts, § 1017 (1967), states, "In general, where a contract of ordinary employment stipulates for, or where usage requires, a certain period of notice, the employment may be cancelled on shorter notice or with none at all, upon payment of wages or salary for the period of notice." In the present case, the firm failed to pay Moeller for the notice period, beginning on March 31, 1982. Also, in Louisiana Oil Corp. v. Bryan, 165 Miss. 157, 160, 147 So. 324, 325 (1933), this Court found a breach of contract where, as here, the termination occurred prior to the expiration of the notice term.
Based on the authorities above, the chancellor correctly found that the firm terminated Moeller's employment on March 31, 1982, thereby breaching the terms of the Employment Agreement, which required sixty days' prior written notice.
The appellants next object to the award of $9,166.66 for two months' salary, covering the sixty days' notice period. They point to Moeller's earnings of $840.00 in April and $3,229.00 in May, arguing that such should mitigate the award. In Batesville-Southwestern Railroad Co. v. Vick, 134 Miss. 480, 484, 99 So. 7 (1924), this Court limited the recovery of a wrongfully discharged employee to the "actual damages he sustained, which is the amount he would have received if he had been permitted to complete the contract less what he has earned in the meantime... ." This is consistent with 5 Corbin on Contracts § 1095 (1964), which states, "The damages that [an employee] can recover for a wrongful discharge ... are the total amount of the unpaid wages that were promised to him for his service, less the amount that he can earn by making reasonable effort to obtain similar service under another employer." Applying this rule to the case at issue, we reduce the chancellor's award of $9,166.66 by $4,069.00, allowing damages of $5,097.66 to stand.
The appellants also fault the award of $5,288.00 for five weeks of accrued vacation, arguing that their sole obligation under the Employment Agreement relates to salary for the notice period. Yet, elsewhere in the Employment Agreement, the firm granted Moeller vacation time with pay, the unused part of which the chancellor listed as damages.
In Livestock Feeds, Inc. v. Local Union No. 1634 of Congress of Industrial Workers, 221 Miss. 492, 507, 73 So.2d 128, 134 (1954), the Court awarded a pro-rata share of vacation pay to employees, who had received ten days' notice of termination, prior to cessation of the business' operations, stating,
Certainly, it could not be successfully maintained that appellant could terminate the employment under similar circumstances and thereby escape liability for the regular wages of its employees earned to the date of such termination. We can perceive no difference in the result to follow where the wages claimed consist of vacation pay.
See also, Buse v. Mississippi Employment Security Commission, 377 So.2d 600, 601 (Miss. 1979), Ross v. Fair, 145 Miss. 18, 22, 110 So. 841, 842 (1927).
Consequently, the Court holds that an employee, contractually due vacation pay at the time of his involuntary dismissal, has a claim for such against his employer, *68 absent contract terms to the contrary. We affirm then the chancellor's award of $5,288.00.
Additionally, the chancellor awarded Moeller $16,880, representing the purchase price of his four hundred shares of stock in the Association, and $8,778, representing the interest paid on the bank note, which financed their purchase. These damages resulted from the chancellor's finding that the "execution of the Employment Agreement and the Stock Redemption Agreement was so closely related and so closely intertwined [that] the breach of the Employment Agreement by the Defendants also necessitates a breach of the Stock Redemption Agreement."
With substantial evidence to support the chancellor's finding, we concur and rescind the Stock Redemption Agreement, affirming the award of $16,880 as restitution for Moeller's stock purchase. Particularly, we note that the breach of the Employment Agreement substantially defeated the purpose of the Stock Redemption Agreement, where the firm summarily dismissed Moeller, a part owner, in violation of his Employment Agreement, which the Association had extended to him solely as a benefit of that ownership interest. See, Gulf South Capital Corp. v. Brown, 183 So.2d 802, 805 (Miss. 1966); Light, Heat and Water Co. of Jackson v. City of Jackson, 73 Miss. 598, 646, 19 So. 771, 774 (1895); Olin Corp. v. Central Industries, Inc., 576 F.2d 642, 646 (5th Cir.1978). We reverse, though, the award of $8,778 for the time value of the purchase price.
The Court also rejects awards for the loss of undistributed profits, pension and profit sharing contributions, trips to various professional conferences, and relocation expenses. Specifically, we refuse to uphold an award of $4,500, representing Moeller's share of undistributed profits, where there was no evidence, other than Moeller's own testimony, to prove the profits' existence, no evidence to support the particular award of $4,500, and no evidence that any other stockholder in the Association likewise received a distribution. Moreover, we are unwilling to uphold the award of undistributed profits, based on Moeller's ownership interest, while simultaneously rescinding the Stock Redemption Agreement, restoring to Moeller the stock's purchase price and ordering his surrender of the outstanding shares.
We reverse the award of $6,400, as well, reflecting Moeller's loss of fiscal 1983 pension and profit-sharing contributions under the American Bar Association's Master Profit-Sharing Plan. According to its terms, the plan required the firm to make a contribution for Moeller only upon the completion of one thousand hours of service within the fiscal year. There is no showing that between March 1, 1982, the first day of the firm's fiscal year, and March 31, 1982, the date of his termination, Moeller worked one thousand hours for the appellants. Indeed, the entire month consists of only 744 hours.
In addition, Moeller is not entitled to damages for the 30% "uninvested" portion of his pension and profit-sharing plan, amounting to $3,111. The evidence showed that Moeller relinquished this sum when he asked to withdraw from the plan prior to complete vesting. Since Moeller enjoyed no more than an "at will" contract, requiring sixty days' notice for termination, it was improper to award damages for this loss, having been suffered as a result of his termination prior to the requisite ten-year period for complete vesting.
Likewise, although there were discussions concerning attendance of A.B.A. Conventions and Mid-Winter Meetings, during negotiations prior to Moeller's purchase of stock in the Association, and the Employment Agreement encouraged participation in "professional meetings, professional conventions, and post-graduate course[s]," the evidence shows that Moeller voluntarily forfeited these trips, having called such a "litmus paper test" of his loyalty to the firm while it suffered economic reverses. Indeed, other members of the firm also missed such trips.
Lastly, the chancellor awarded $1,688.00 to Moeller, being 10% of the assessed *69 value of his stock, because of the Association's failure to allow him access to corporate records, a violation of Miss. Code Ann. § 79-3-99 (1972). Since Moeller failed to plead specifically this item of special damages, as required by M.R.C.P. 9(g), this award must also be reversed.

II.

TORT DAMAGES
The chancellor also found that the appellants' conduct was tortious in nature, awarding $93,000, which included punitive damages, attorneys' fees, loss of income and mental anguish. On the facts of this case, we find neither a tortious breach of the Employment Agreement nor a tortious interference with Moeller's business relationships, and reverse.
Ordinarily, punitive damages are not recoverable in actions for breach of contract. Aetna Casualty & Surety Co. v. Doleac Electric Co., Inc., 471 So.2d 325, 332 (Miss. 1985). In fact, they are disfavored in law, and allowed only with caution. Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 460 (Miss. 1983). Yet, a breach of contract accompanied by intentional wrong, insult, abuse or such gross negligence as to constitute an independent tort, justifies the award of punitive damages. State Farm Fire and Casualty Co. v. Simpson, 477 So.2d 242, 250 (Miss. 1985); New Hampshire Insurance Co. v. Smith, 357 So.2d 119, 121 (Miss. 1978); Progressive Casualty Co. v. Keys, 317 So.2d 396, 398 (Miss. 1975).
In the case at issue, the Court does not find such intentional wrong or gross negligence as to justify the award of $10,000 for punitive damages. Indeed, had the appellants but paid Moeller for the sixty days' notice period at the time of the dismissal, his tenure would have terminated without breach of the "at will" contract. Though unfortunate, the appellants' actions fail to meet the standard for punitive damages stated above.
For lack of punitive damages, we also reverse the award of attorneys' fees. Aetna Casualty & Surety Co. v. Steele, 373 So.2d 797, 801 (Miss. 1979); Cooper v. United States Fidelity & Guaranty Co., 186 Miss. 116, 122, 188 So. 6, 7 (1939); Yazoo and Mississippi Valley Railroad Co. v. Consumers' Ice & Power Co., 109 Miss. 43, 48, 67 So. 657, 658 (1915).
The chancellor also awarded $12,000 for lost income. We reverse, holding that the firm is not responsible for Moeller's income beyond the sixty days' notice period, regardless of any resulting loss of future income.
The chancellor's last award was $20,000 for mental anguish. Finding that the appellants had a contractual right to discharge Moeller, we conclude from the evidence an absence of willful, wanton, malicious, or intentional wrong, and reject the award of damages, Daniels v. Adkins Protective Services, Inc., 247 So.2d 710, 711 (Miss. 1971); Lyons v. Zale Jewelry Co., 246 Miss. 139, 149-150, 150 So.2d 154, 158 (1963); Saenger Theatres Corp. v. Herndon, 180 Miss. 791, 799, 178 So. 86, 87 (1938); Sears, Roebuck & Co. v. Devers, 405 So.2d 898, 902 (Miss. 1981).
The appellants also argue that the chancellor erred when he held that the appellants had tortiously interfered with Moeller's business relationships, following his separation from the firm. Indeed, there is no evidence before the Court that the appellants' actions, specifically relating to the transfer of clients' files, resulted in any pecuniary loss to Moeller. The record fails to disclose a single client either influenced to terminate Moeller's services due to the intervention of the appellants, or harmed by their delay of a file. Consequently, without any showing of damages, it was error for the chancellor to find for Moeller on this ground.
Finally, the chancellor imposed joint and several liability on the appellants, including Louis Fuselier, Emile Ott, and Curtiss McKee, as members of the Association's Board of Directors. Due to the absence of tortious conduct, we find the Association solely liable for the payment of damages, awarded above. Mississippi Printing Co., Inc. v. Maris, West and Baker, Inc., 492 So.2d 977, 978 (Miss. 1986); First Mobile *70 Home Corp. v. Little, 298 So.2d 676, 679 (Miss. 1974); Grapico Bottling Co. v. Ennis, 140 Miss. 502, 509, 106 So. 97, 98 (1925).
Consistent with our opinion, the Court affirms the award of $27,265.66, representing two months' salary for the notice period, accrued vacation pay, and the stock's purchase price, minus $7,500.00, owed by Moeller to the firm, which leaves a total of $19,765.66.
AFFIRMED IN PART, REVERSED AND RENDERED IN PART.
WALKER, C.J., ROY NOBLE LEE, HAWKINS, P.JJ., and DAN M. LEE, ROBERTSON and SULLIVAN, JJ., concur.
PRATHER and ANDERSON, JJ., not participating.